IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

MICHELE BINGHAM,                          §
    PLAINTIFF,                        §
                                      §
VS.                                       §   CIVIL ACTION NO. 4:08-CV-321-Y
                                      §
MICHAEL J. ASTRUE,                        §
COMMISSIONER OF SOCIAL SECURITY,          §
    DEFENDANT.                        §

FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b).  The Findings, Conclusions and Recommendation of

the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

A.      STATEMENT OF THE CASE

Plaintiff Michele Bingham brings this action pursuant to Section 405(g) of the Social

Security Act, Title 42 of the United States Code, for judicial review of a final decision of the

Commissioner of Social Security denying her claim for disability insurance benefits under Title II

of the Social Security Act.  Bingham applied for disability benefits on January 24, 2003, with an

amended disability onset date of January 1, 2001. (Tr. 24, 136).  She met the insured status

requirements at all times relevant to the administrative decision.  (Tr. 151).

After her application was denied initially and on reconsideration, Bingham requested a

hearing before an administrative law judge (the "ALJ").  ALJ James Wendland held a hearing in January 2005 and issued an unfavorable decision on February 23, 2005, but that decision was vacated by the Appeals Council.  (Tr. 24, 82-84).  The ALJ held a supplemental hearing on January 25, 2007, which Bingham attended with counsel.  On March 30, 2007, the ALJ issued another unfavorable decision, finding that Bingham was not  disabled because she was capable of performing a modified range of sedentary work activity.[1]  (Tr. 24-39).  The Appeals Council denied Bingham's request for review, leaving the ALJ's decision to stand as the final decision of the Commissioner.  (Tr. 12).

## B.  STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity.  42 U.S.C. § 423(d)(1)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed.  20 C.F.R. § 404.1520.  First, the claimant must not be presently working at any substantial gainful activity. 20 C.F.R. § 404.1527.  Second, the claimant must have an impairment or combination of impairments that is severe. 20 C.F.R. § 404.1520(c). At the third step, disability will be found if the claimant's impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations.  *Id.* § 404.1520(d).  Fourth, if disability cannot be found on the basis of a listing alone, the impairment or impairments must prevent the

---

[1]  Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  20 C.F.R. §404.1567(a).

claimant from returning to his past relevant work. *Id.* § 404.1520(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* § 404.1520(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley*, 197 F.3d at 198. A finding at any point in the five-step process that a claimant is disabled or not disabled is conclusive and terminates the analysis. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id*. A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* Conflicts in the evidence are for the Commissioner and not the court to resolve. *Masterson*, 309 F.3d at 272. The court will not re-weigh evidence, try questions *de novo,* or substitute its judgment for the Commissioner's, even if the court believes the evidence weighs against the Commissioner's decision. *Id.*; *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000); *Hollis*, 837 F.2d at 1383.

C.      ISSUES

Bingham alleges the following as grounds for relief from the Commissioner's decision:

1.      The ALJ erred in failing to evaluate the existence and impact of obesity on Bingham's ability to work;

2.      The ALJ's evaluation of the medical opinions is contrary to law and unsupported by substantial evidence; and

3.      The ALJ erred in his determination that Bingham was capable of working on a sustained basis.

D.      ADMINISTRATIVE RECORD

1.      Medical and Vocational History

Bingham was born April 1, 1959.  (Tr. 136).  She has a college education and worked as an airline reservations agent until she was placed on medical leave in 2000.  (Tr. 155, 160).  Medical reports confirm that she received counseling and medication from September 2001 through January 2002 for depression, anxiety and post-traumatic stress disorder. (Tr. 222-25, 342-47).  The ALJ observed that none of the counseling records documented the performance of a formal mental status examination or contained any clinical observations, and thus, the records provided little corroboration for Bingham's allegation that she was completely disabled during that period.  (Tr. 26).

In March 2002, Bingham saw nurse practitioner Carol Shelley, who noted that Bingham had

been diagnosed with fibromyalgia.[2]  Bingham weighed 244 pounds.  She was mildly depressed, but her thinking was coherent, logical and goal directed.  She denied any suicidal or homicidal thoughts. Shelley gave Bingham a trial prescription for Neurontin and prescribed a different antidepressant at Bingham's request.  (Tr. 249).  In April, Shelley added an anti-inflammatory pain medication and medication for restless legs syndrome[3] to Bingham's treatment regimen.  (Tr. 246).  Prescriptions for a muscle relaxer and allergy medication were added at Bingham's follow-up visit in June 2002. (Tr. 242).  On June 26, 2002, Shelley completed a form entitled "Attending Physician's Statement of Disability," and opined that Bingham was disabled as a result of fibromyalgia and depression. (Tr. 241).

Bingham saw neurologist John Harney, M.D., on July 25, 2002, for complaints of pain, insomnia, and fatigue.  (Tr. 273).  On examination, the neurologist found that Bingham had 18 positive trigger points out of the 18 trigger points tested.  Bingham had almost full cervical range of motion, and straight-leg raising was negative.  She was neurologically intact, with normal motor strength and muscle tone, fine finger movements, reflexes, sensation, coordination, and gait. Harney diagnosed fibromyalgia.  He recommended that Bingham use non-steroid anti-inflammatory medication for pain, with occasional use of narcotic medication for breakthrough pain.  He also advised that she participate in an aggressive myofascial outpatient treatment program.  (Tr. 274). During a follow-up visit in October, Bingham reported only slight improvement in her pain level.

---

[2] Fibromyalgia is a medical condition marked by chronic diffuse aching and stiffness in the muscles and soft tissues.  *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 243 n.3 (6th Cir. 2007).

[3] The syndrome refers to unpleasant and deep discomfort inside the calves when sitting or lying down, especially just before sleep, producing an irresistible urge to move the legs.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1869 (31st ed. 2007).

Harney prescribed additional narcotic pain medication.  (Tr. 271).

Bingham was referred for a consultative psychiatric evaluation with Jyoti Patel, M.D., in April 2003.  (Tr. 231).  Bingham complained of depression, anxiety, and a history of abuse by a former boyfriend.  Her symptoms included memory loss, impaired concentration and attention, sleep disturbances, low energy and motivation, irritability, agitation, poor impulse control, and difficulty controlling her weight.  On examination, she was cooperative, coherent, and oriented.  She made good eye contact, but had a sad and tearful affect with a depressed mood.  Bingham admitted having recurrent suicidal thoughts.  (Tr. 231-32).  Patel assessed Bingham's memory as intact, as was her concentration.  She was able to interpret proverbs, and she demonstrated fair insight and judgment. Patel diagnosed depression, post-traumatic stress disorder, and panic attacks with agoraphobia.  He assigned a guarded prognosis and opined that Bingham would need assistance managing her benefits.  (Tr. 233).

Bingham saw the nurse practitioner in April 2003 for right shoulder pain.  (Tr. 341).  Shelley diagnosed shoulder pain with impingement and ordered diagnostic imaging, which showed a partial tear of the tendon and degenerative changes in the right shoulder.  (Tr. 237).  Bingham was referred to an orthopedic surgeon, who examined her and diagnosed degenerative arthritis with a partial right rotator cuff tear.  Bingham's shoulder was treated with pain relief injections and physical therapy. (Tr. 281-90).

Harney reported in June 2003 that Bingham's fibromyalgia pain was much improved, she was functioning better at home, and was ready to begin a program of light exercises and stretching. (Tr. 268).  He also prescribed medication on a trial basis for Bingham's complaints of persistent

fatigue.  (Tr. 268).  He issued a brief statement in July 2003 indicating that Bingham should remain on medical leave until July 2004 for fibromyalgia.  (Tr. 266).

In November 2003, Harney prepared a written assessment of Bingham's functional capacity. (Tr. 338-40).  He opined that she was able to stand or walk for less than fifteen minutes continuously and less than one hour total per day; sit for thirty minutes continuously and four hours total per day; lift and carry no more than ten pounds occasionally; reach, handle, finger, and feel occasionally; and stoop, bend, crawl or kneel only occasionally. (Tr. 338-40).  He also opined that Bingham would need to rest for an hour during the workday for pain management and fatigue attributable to fibromyalgia.  (Tr. 338).

At a follow-up visit  in December 2003, Harney noted that Bingham was doing well and managing her fibromyalgia extremely well.  (Tr. 336).  Bingham reported stable pain levels of 5 or 6 for the past year and denied any side-effects from her medication.  She was walking two blocks regularly and performed daily stretching exercises.  She advised that she was functioning at work and around the house.  On examination, her gait was stable, her strength was normal, and she exhibited normal cognition.  Her trigger points were moderately severe and she had a moderate decrease in her cervical range of motion. Harney opined that Bingham's fibromyalgia was well controlled on her current treatment regimen.  (Tr. 336).

When Bingham saw the neurologist in April 2004, she reported that she felt optimistic and planned to do some volunteer work and exercise more.  (Tr. 335). In August, Bingham reported that she was still doing well.  The changes in her pain medication had caused her pain level to rise from 6.5 to 7, but she had no side-effects except for morning sluggishness caused by the medication she

used for her restless legs syndrome.  (Tr. 351).  Harney prescribed a less sedating medication for restless legs syndrome.  He also recommended that Bingham try a Pilates exercise program. Bingham exhibited full range of motion in her neck and shoulder, with normal gait and station.  (Tr. 351).

In February 2005, Bingham reported doing well overall, but had a mild flare-up in pain due to the cold weather.  Her language, cognition and mood remained good, and her trigger points were diminished.  Her strength and gait were normal, and she demonstrated good cervical and shoulder range of motion.  Harney described Bingham's fibromyalgia and restless legs syndrome as well-controlled.  (Tr. 361).

Bingham also underwent a cardiopulmonary exercise test in May 2005 that was ordered by treating physician Larry Sharp, D.O.  (Tr. 458).  The test was stopped early because Bingham complained of non-cardiac chest pain and low back pain.  Sharp opined that this could be due to a possible restrictive respiratory defect[4] and thought that Bingham's obesity could be masking a cardiovascular defect.  Sharp assessed a Class 4 severe impairment of the whole person based on the results Bingham achieved before the test was terminated.  (Tr. 433, 458).

When Bingham saw Harney in August, she reported that she had recently been diagnosed with Lyme disease.  She complained that her pain level had increased to an 8 on a scale of 10, but two analgesic tablets provided good relief.  No abnormal findings were noted on examination. (Tr. 360).  In December 2005, Bingham reported increased pain due to the cold weather. Harney diagnosed neuropathic pain and prescribed additional medication to address Bingham's symptoms.

---

[4] Pulmonary function studies performed that same date indicated a mild restrictive abnormality.  (Tr. 448).

(Tr. 373).  Bingham returned in May 2006.  Her leg pain had improved, but she was not sleeping well.  She also had migraine headaches twice a week, but the headaches were controlled with medication.  On examination, Bingham demonstrated a normal gait, normal strength, and intact cognition.  Eighteen out of eighteen possible trigger points were positive.  She was given a prescription for sleeping pills. (Tr. 372).

Bingham saw Sharp on July 25, 2006.  Sharp observed that Bingham's hands were swollen, and Bingham also thought she might have carpal tunnel syndrome.  She was still not sleeping well. (Tr. 427).  In November 2006, Harney noted a slight worsening in Bingham's symptoms due to weather changes, and Bingham had a mild tremor in her upper extremities.  (Tr. 464).

2.      Administrative Hearings

During the first administrative hearing, Bingham testified that she suffered from chronic flu-like pain.  (Tr. 483).  She also complained of confusion, poor memory, and not sleeping well.  She took medication for depression and anxiety, but reported that she still experienced panic attacks when she left her house.  (Tr. 484).  Bingham testified that she tried to exercise, but walking half a block caused a flare-up in her pain that persisted for two or three days.  (Tr. 486).  Sitting made her feel stiff, and she estimated that she could sit for less than an hour.  She did some light housework, but spent most of the day lying down or napping.  (Tr. 487).

At the supplemental hearing in 2007, Bingham testified that her condition had worsened. (Tr. 530).  She testified that all of her large muscle groups were stiff and tender to the touch. Medication helped, but did not completely alleviate her symptoms.  Bingham testified that she needed to rest for most of the day. (Tr. 531).  She also complained of dropping things and tremors

in her hands.  (Tr. 535-36).  She continued to take her antidepressant, but testified that she could not afford counseling or therapy.  (Tr. 536).

Bingham's treating neurologist also testified by telephone during the second hearing.  (Tr. 513).  Harney stated that he was a board-certified neurologist and had treated Bingham since July 2002.  Her diagnosis was chronic pain syndrome associated with fibromyalgia, and this diagnosis was based on generalized muscular pain, morning stiffness, chronic insomnia, and the presence of eighteen positive trigger points on examination.  (Tr. 514).  He noted that treatment had been only minimally effective in Bingham's case even though she was a motivated patient.  He did not suspect her of malingering or exaggerating her symptoms.  (Tr. 515).

When asked to explain the restrictions he had outlined in his 2004 medical source statement, Harney affirmed that those limitations had existed during the entire time that he had treated Bingham.  (Tr. 520). He explained that the problem with fibromyalgia is that it caused muscles to tighten up, which restricted the blood flow and caused the muscles to cramp and stiffen.  He indicated that this same result occurred with overuse of the muscles or immobilization, such as sitting for extended periods.  (Tr. 516-18).  Harney explained that a neurological examination of a fibromyalgia patient would be normal because the patient often could exert a muscle once or twice without difficulty, and it was only repetition of the movement that was harmful.  (Tr. 519). He also noted that  fibromyalgia was associated with increased anxiety and depression.  (Tr. 518).

Vocational expert Donna Humphries testified that Bingham's previous work was sedentary and semi-skilled.  The ALJ then asked her to consider a hypothetical claimant of Bingham's age, education and work experience who was capable of sedentary work with the following restrictions:

- • not required to stoop, balance, crouch, crawl, kneel or climb stairs and ramps more than occasionally
- • not required to climb scaffolds, ladders or ropes
- • not required to sit without the opportunity to occasionally stand in addition to lunch and normal legal breaks during the work day
- • not required to walk more than ½ block's distance at one time without the opportunity to sit
- • not required to work above shoulder level with the dominant right upper extremity
- • not required to repetitively push, pull or perform extended reaching with the dominant right upper extremity
- • not required to handle or finger objects more than frequently
- • not required to work at unguarded heights and near unguarded hazards or mechanical equipment
- • not required to perform more than the lower end of detailed instructions
- • not required to have more than superficial interaction with the public
- • not required to be exposed to extreme temperatures and high humidity, and
- • not required to operate any motor-driven vehicle.

(Tr. 539-40).  Humphries testified that these restrictions were not compatible with Bingham's past relevant work, but there were other jobs that fit the ALJ's hypothetical.  Examples included inspector positions, with 8,000-10,000 jobs in the national economy; assembly production positions, with approximately 50,000 jobs in the national economy; and manual hand labor/product helper positions, with approximately 15,000 jobs in the national economy.  (Tr. 544-45).  Humphries affirmed that her testimony did not conflict with information in the <u>Dictionary of Occupational Titles</u>.  (Tr. 545).

   3.  ALJ Decision

   The ALJ found that Bingham had not engaged in substantial gainful activity since January 1, 2001.  He further found that Bingham had severe fibromyalgia, restless legs syndrome, osteoarthritis, a right rotator cuff tear, Lyme disease, chronic pain syndrome, depression, anxiety, and post-traumatic stress disorder; however, he found that she had no impairment or combination

of impairments that met or equaled a listed impairment.  (Tr. 25).  Instead, the ALJ found that Bingham retained the residual functional capacity (RFC) to perform a modified range of sedentary work with the same restrictions that were presented to the vocational expert during the administrative hearing.  (Tr. 36-37).  Based on the vocational expert's testimony, the ALJ found that Bingham was unable to perform her past relevant work, but was capable of performing other work that existed in significant numbers in the national economy.  (Tr. 38).  Accordingly, the ALJ found that Bingham was not disabled and was not entitled to disability insurance benefits at any time through the date of his decision.  (Tr. 39).

E.      DISCUSSION

        1.      Obesity

        Bingham contends that the ALJ erred because he failed to evaluate the existence and impact of obesity on her ability to work.  The Social Security rulings recognize that obesity, although not a listed impairment, can reduce an individual's occupational base for work activity in combination with other ailments. See SOCIAL SECURITY RULING 02-1p;  SOCIAL SECURITY RULING 96-8p.  A claimant's obesity must be considered at all steps of the sequential evaluation process.  SECURITY RULING 02-1p.  An obese individual may be found disabled  if she has another impairment that, by itself or in combination with obesity, meets the requirements of a listing.  *Id.* Obesity is also a relevant consideration during the later steps of the evaluation process because obesity can cause limitation of function and can affect a person's ability to sustain a function over time.  *Id.*  However, the Commissioner does not make any assumptions about the severity or functional effects of obesity combined with other impairments, and each case must be decided on its own record.  *Id.*

FINDINGS, CONCLUSIONS AND RECOMMENDATION OF
THE UNITED STATES MAGISTRATE JUDGE–PAGE 12 OF 21

The medical records indicate that Bingham is 5'5" and her weight has ranged from 205 to 252 pounds during the period considered by the ALJ.  (Tr. 153, 324, 350, 363, 461).  Bingham notes that her Body Mass Index (BMI)[5] placed her in the range of extreme obesity, yet the ALJ did not address obesity in his decision,[6] which is contrary to Ruling 02-1p.  Social Security Rulings are published under authority of the Commissioner and are binding on the Administration.  *Hall v. Schweiker*, 660 F.2d 116, 119 n.4 (5th Cir. [Unit A] 1981)(per curiam).  An agency must follow its own procedures, even if those procedures are more rigorous than what would otherwise be required.  *Hall*, 660 F.2d at 119, *cited in Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000).  Should the agency violate its internal rules and prejudice result, the proceedings are tainted and any action taken cannot stand.  *Hall*, 660 F.2d at 119.

Bingham has demonstrated that the ALJ violated Ruling 02-1p, but she has not shown prejudice.  There is no specific weight or BMI that equates to a severe impairment, nor do descriptive terms for obesity like "extreme" or "morbid" require a finding of severity or correlate with any specific functional loss.  SOCIAL SECURITY RULING 02-1p.  Bingham did not allege obesity as a basis for her disability application and she does not demonstrate that consideration of the obesity issue might have changed the outcome as no medical source has attributed any functional limitations to her obesity.  At best one treating source speculated that obesity was masking another impairment, but the medical records in the administrative file do not reflect that any follow-up

---

[5] BMI is the ratio of a person's weight to his height squared. See SOCIAL SECURITY RULING 02-1p.  It is used as a classification system to assess obesity and a person's risk of developing obesity-related impairments. *Id.*

[6] The ALJ noted that Bingham had difficulty controlling her weight, but this was mentioned only as a symptom of her mental impairment.  (Tr. 28).

testing was performed to confirm the physician's concern.  Bingham has identified no functional

limitations imposed by her obesity that are not already accommodated by the ALJ's residual

functional capacity determination, nor does the record indicate that obesity renders her disabled

when considered in combination with her other impairments.   The court will not vacate a judgment

unless the substantial rights of a party have been affected.  *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th

Cir. 1988). The ALJ erred by not considering Bingham's obesity in accordance with Ruling 02-1p

was error, but the error did not prejudice Bingham's substantial rights and does not require reversal

of the Commissioner's decision.

      2.     Medical Opinions

Bingham contends that the ALJ's decision is based on his erroneous demand that her

physicians produce objective confirmation of fibromyalgia because this is contrary to the nature of

the disease.  She complains that the ALJ dismissed firsthand medical opinions from her primary care

physician, nurse practitioner, and treating neurologist and instead relied on his own intuitive notions

about her medical condition.

The Fifth Circuit cautions judges not to succumb to the temptation to play doctor because

common sense can mislead and lay intuition about medical phenomena are often wrong.  *Frank v.

Barnhart*, 326 F.3d 618,622 (5th Cir. 2003).  Opinions, diagnoses, and medical evidence from a

treating physician who is familiar with the claimant's impairments, treatments, and responses should

be given great weight in determining disability.  *See  Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir.

1995);  *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994).  Controlling weight is assigned to

the opinions of a treating physician if well-supported by medically acceptable clinical and laboratory

diagnostic techniques and not inconsistent with other substantial evidence in the record.  20 C.F.R.

§ 404.1527(d)(2); *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995).  Before rejecting a treating

source opinion, the ALJ must address several relevant factors, including the length of the treatment

relationship, frequency of examination, nature and extent of the treating relationship, evidence

supporting the opinions, the consistency of those opinions, and medical specialization.  *See* 20

C.F.R. § 404.1527(d); *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000).  *See also* SOCIAL

SECURITY RULING 96-2p, 96-5p. However, the determination of disability always remains the

province of the ALJ, and the ALJ can decrease the weight assigned to a treating physician's opinion

for good cause, which includes disregarding statements that are brief and conclusory, unsupported

by acceptable diagnostic techniques, or otherwise unsupported by the evidence.  *Leggett*, 67 F.3d

at 564; *Greenspan*, 38 F.3d at 237.  *See also* 20 C.F.R. § 404.1527(e).

Bingham complains that the ALJ erred in rejecting the opinions of her treating neurologist,

primary care physician and nurse practitioner.  Bingham's primary care physician, through his nurse

practitioner, had opined on several occasions that Bingham's medical leave should be extended due

to her inability to work. The ALJ declined to adopt these opinions, reasoning that there was a

complete absence of objective corroboration of signs, symptoms, and functional limitations to

support their diagnoses or conclusions that Bingham was disabled.  (Tr. 27).  The ALJ also

considered the neurologist's opinions about Bingham's functional capacity, but found that the

opinions were based on Harney's beliefs about fibromyalgia patients generally and his

unquestioning acceptance of Bingham's subjective complaints in the absence of significant objective

findings on examination that would tend to corroborate her complaints.  (Tr. 33).  Accordingly, the

ALJ declined to accept Harney's conclusion that Bingham was completely disabled.  (Tr. 33).

Bingham contends that the ALJ did not appreciate the nature of fibromyalgia or he would not have demanded objective corroborating evidence.  Fibromyalgia is recognized as an elusive condition that does not lend itself to objective testing.  *See  Rogers v. Commissioner of Social Security,* 486 F.3d 234, 243-45 (6th Cir. 2007); *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2nd Cir. 2003); *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996).  But merely carrying the diagnosis of fibromyalgia does not mandate a finding of disability.   *See Sarchet*, 78 F.3d at 307.

A review of the decision demonstrates that the ALJ understood and fulfilled his responsibility to weigh the medical opinions even if he did not include an express statement addressing each of the factors outlined in the regulations.  The ALJ included a thorough review of the progress notes from Harney and from the nurse practitioner who treated Bingham, including Bingham's responsiveness to treatment.  The ALJ noted for example that the nurse practitioner recorded no subjective complaints or objective observations that would support diagnoses of fibromyalgia or restless leg syndrome.  (Tr. 27).  While Harney testified that fibromyalgia caused stiffness, which could be inferred by observing the slowness of the patient's movements and decreased range of motion, the ALJ also noted that neither of these indicators had been routinely reported in Bingham's treatment records. (Tr. 32). The ALJ was persuaded that Harney's testimony was largely based on characteristics of fibromyalgia patients generally, rather than Bingham specifically.  (Tr. 30, 33).  The ALJ found Harney's explanation at odds with Bingham's own report of her daily activities, (Tr. 30),  and Harney's recommendation that Bingham participate in a physical therapy program.  The ALJ further found that Harney indicated a willingness to guess at

Bingham's abilities as there was no evidence that Harney had actually measured Bingham's ability to perform any specified activity.   (Tr. 33).

The ALJ accepted that Bingham has fibromyalgia and that the disease imposes some functional limitations, but based on the record as a whole and inconsistencies revealed by the record, he found that Bingham's limitations did not rise to the disabling level she claimed.  The ALJ did not improperly substitute his lay opinion for the medical opinions in the record or base his determination on a misunderstanding of Bingham's impairment.  He articulated good cause for declining to adopt the treating source opinions favoring disability, and substantial evidence supports that decision. Findings supported by substantial evidence are conclusive, and the reviewing court may not substitute its own judgment for that of the Commissioner even if the court finds that the evidence preponderates toward a different result. *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir.1980).

Bingham also contends that the ALJ erred in failing to discuss several medical findings that appear in Sharp's treatment records.  Sharp had reported that Bingham was obese; that she had impaired lung function; that her obesity prevented her from completing an exercise stress test and possibly masked cardiovascular disease; and that she had a severe impairment of the whole person. As already discussed, the ALJ's failure to address Bingham's obesity was error, but not reversible error because no treating source–including Sharp–attributed any functional restrictions to Bingham's obesity.  The ALJ reviewed Sharp's assessment of a possible respiratory defect, but noted that this was not mentioned in any of Sharp's subsequent reports.  (Tr. 31).  Similarly, Sharp's speculation that obesity was concealing another impairment was not the subject of subsequent testing to confirm that Bingham had cardiovascular disease, nor was she treated for any cardiac or pulmonary condition

other than hypertension, which the ALJ determined was a non-severe impairment.  (Tr. 33).  Sharp

assessed a "Class 4" severe impairment based on Bingham's unsuccessful exercise stress test, but

he did not impose any functional restrictions or offer follow-up treatment other than recommending

that she begin an exercise program, which was a recommendation echoed by other treating sources.

(Tr. 274, 361, 458-59).  Sharp also referred to Bingham several times in his treatment notes as

"disabled."  But merely classifying an impairment as severe or identifying a person as disabled is

entitled to no special weight in the disability determination process because these are not medical

opinions, but are opinions on issues reserved to the Commissioner.  *See* 20 C.F.R. § 404.1527(e).

Bingham has not demonstrated that the ALJ gave inadequate weight to Sharp's records or that his

failure to provide a more thorough review of those records was prejudicial.

The ALJ provided a detailed discussion of the medical records and Bingham's subjective

complaints, and he crafted a RFC assessment that accommodates the limitations imposed by her

physical and mental impairment.  The ALJ's decision is not perfect, but it is supported by substantial

evidence and Bingham has not demonstrated that any infirmities in the ALJ's assessment of the

medical opinions or other evidence prejudiced her substantial rights.

3.      Sustained Work Activity

Bingham contends that the ALJ erred because he did not explain how he decided that she

could work on a sustained basis.  Residual functional capacity (RFC) is an assessment of an

individual's ability to do sustained work-related physical and mental activities in a work setting on

a regular and continuing basis. SOCIAL SECURITY RULING 96-8p. *See also  Myers v. Apfel*, 238 F.3d

617, 620 (5th Cir. 2001).  A regular and continuing basis is eight hours a day, five days a week, or

an equivalent work schedule.  SOCIAL SECURITY RULING 96-8p.  The Fifth Circuit has adopted the

principles underlying Ruling 96-8p and decided that, in assessing RFC, the adjudicator must discuss

the individual's ability to perform sustained work activities in an ordinary work setting on a regular

and continuing basis.  *Myers*, 238 F.3d at 620.  Thus, a finding that a claimant can perform

substantial gainful activity requires a determination that the claimant can both find work and, taking

account of the claimant's exertional and non-exertional limitations, maintain employment.  *Watson*

*v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002)(citing *Wingo v. Bowen*, 852 F.2d 827, 831 (5th

Cir.1988)).  *See also Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986).  Consistent with the Fifth

Circuit's requirements, the ALJ specified that Bingham could perform work within her RFC on a

continuing and sustained basis.  (Tr. 36).

　　　　Bingham concedes that the ALJ understood that his RFC assessment must capture her ability

for sustained work, but complains that the ALJ did not explain how he reached that decision or

identify the evidence supporting his decision.  She asserts that this is especially harmful in her case

because fatigue is one of the hallmarks of fibromyalgia.  Her argument presents no basis for

overturning the Commissioner's decision.

　　　　The ALJ explained that his RFC determination was based on the evidence as a whole and

that he gave Bingham the benefit of the doubt with respect to her subjective complaints of chronic

pain, fatigue, impaired social and mental functioning, and reduced exertional capacity, but her

complaints that she must lie down all day and avoid activity altogether were not corroborated by the

objective medical records.  (Tr. 37).  This explanation, coupled with a thorough review of the

medical records and the testimony presented during the administrative hearing, reflects that the ALJ

complied with the requirements in this circuit and Ruling 96-8p.  Additionally, there is no indication that the ALJ failed to appreciate that the ability to maintain employment is a consideration inherent in any RFC assessment.  *See Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003).  The ALJ found that Bingham was capable of performing a limited range of sedentary work activity on a sustained basis and that finding is supported by substantial evidence.

RECOMMENDATION

It is recommended that the Commissioner's decision be affirmed.

NOTICE OF RIGHT TO OBJECT TO PROPOSED
FINDINGS, CONCLUSIONS AND RECOMMENDATION
AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document.  The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until May 22, 2009.  The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made.  *See* 28 U.S.C. § 636(b)(1).  Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d

1415, 1428-29 (5th Cir. 1996)(en banc).

ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until May 22, 2009, to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation.  It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED MAY  1 , 2009.


 /s/ Charles Bleil_____
CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE